# Constitutionality of "No Appropriation" Clause in the Watershed Protection and Flood Prevention Act

A "no appropriation" clause in the Watershed Protection and Flood Prevention Act, requiring approval of a construction project by the appropriate committees of the Senate and House of Representatives before Congress may enact appropriations legislation for the project, is constitutional.

February 27, 1969

MEMORANDUM OPINION FOR THE STAFF ASSISTANT TO THE
COUNSEL TO THE PRESIDENT

The immediate question facing the President is what position he should take with respect to the Watershed Protection and Flood Prevention Act enacted in 1954 (Pub. L. No. 83-566, 68 Stat. 666). Between 1954 and 1966 several hundred watershed projects were processed under this law. In 1966 the Johnson Administration objected on constitutional grounds to a provision of the Act requiring committee approval of project plans before appropriations are made. The section provides:

> No appropriation shall be made for any plan involving an estimated Federal contribution to construction costs in excess of $250,000, or which includes any structure which provides more than twenty-five hundred acre-feet of total capacity unless such plan has been approved by resolutions adopted by the appropriate committees of the Senate and House of Representatives . . . .

*Id.* § 2 (as amended, codified at 16 U.S.C. § 1002(2)). President Johnson submitted a bill to Congress to repeal this section and to substitute a provision requiring the Executive to report projects to the committees 30 days before work could be begun. This legislation was not enacted.

It is our understanding that, pursuant to President Johnson's instruction, numerous proposed watershed projects have been held in abeyance despite the fact that the congressional committees approved the projects and that non-itemized funds were appropriated by Congress. Several other watershed projects are being examined within the Executive Branch but have not been submitted to Congress due to the present impasse.

The immediate question involving the watershed projects cannot be fully understood without reference to the broader encroachment problem presented by so-called "committee veto" provisions. There are two types of provisions through which Congress has sought to give its committees oversight of projects authorized under broadly worded enabling legislation. The earlier form, generally referred to as a "come into agreement" clause, sought to authorize committees to approve or disapprove Executive action. The typical "come into agreement" clause provided

that after enabling legislation authorizing projects had been enacted, and after a general appropriation bill had been passed, the Executive still had to receive the approval of the substantive congressional committees having jurisdiction over that type of project before the appropriated money could be spent. The second and later type provides that no appropriation shall be made for projects which do not have committee approval. The language in the Watershed Act is an example of the latter type.

## I. Conclusions

In our opinion, this "no appropriation" clause is not subject to constitutional infirmities. It is unnecessary to decide, in order to reach an opinion on this question, whether the quite different provisions of the "come into agreement" clause are likewise constitutional.

As to the Watershed Act, once it is determined that the "no appropriation" clause is constitutional, the President can resolve the present impasse by simply advising Secretary Hardin to proceed in compliance with the existing statute. Since the law is on the books, the only question for executive determination at this time is whether executive compliance with the act is constitutional. An affirmative instruction to Secretary Hardin will not preclude the President from later taking the position that the related, but in our opinion dissimilar, "come into agreement" clauses are unconstitutional.

As to future bills containing a "no appropriation" clause, the President will have available to him the additional option of vetoing those which he feels are unwise and not in the public interest, even though he may not be of the opinion that the bills are unconstitutional. In making that determination, the President might wish to consider the manner in which similar provisions of other acts have been administered in the past, both with regard to fairness in allocation of projects and with respect to the actual practice followed by Congress under the "no appropriation" clause.

## II. Discussion

Problems with respect to claimed congressional encroachment of this type arose at least as early as the administration of President Woodrow Wilson when Congress incorporated in an appropriation bill the following language:

> [N]o journal, magazine, periodical, or similar Government publication shall be printed, issued, or discontinued by any branch or officer of the Government service unless the same shall have been authorized under such regulations as shall be prescribed by the Joint Committee on Printing . . . .

H.R. 12610, 66th Cong. § 8 ("An act making appropriations for the legislative, executive, and judicial expenses of the Government for the fiscal year ending June 30, 1921, and for other purposes").

President Wilson vetoed the bill and stated in his veto message:

> The Congress has the power and the right to grant or deny an appropriation, or to enact or refuse to enact a law; but once an appropriation is made or a law is passed, the appropriation should be administered or the law executed by the executive branch of the Government.

H.R. Doc. No. 66-764, at 2 (1920).

Congress re-passed the appropriation act without the section to which President Wilson had objected. Pub. L. No. 66-231, 41 Stat. 631 (1920). Similar positions were taken by Presidents Hoover, Roosevelt, Truman, Eisenhower, and Kennedy. *See Separation of Powers: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 90th Cong., pt. 1, at 215–28 (1967) ("SOP Hearings").

There are two principal arguments against the constitutionality of "come into agreement" provisions. The first is the basic separation of powers argument: the President is charged in Article II of the Constitution with the faithful execution of the laws, and once a project is authorized, and money finally appropriated for it, the carrying out of these congressional mandates is placed by the Constitution in the Executive Branch of the government. The second argument is that giving congressional committees power to veto projects proposed by the Executive grants to the Committees final legislative authority which the Constitution, in Article I, granted only to the Congress acting as a whole and subject to the veto power of the President. Thus, this argument runs, "come into agreement" provisions are an unconstitutional delegation of legislative power to congressional committees.

In light of the long line of Presidents and Attorneys General who have adhered to the view that such provisions are unconstitutional, such a view must be deemed to have considerable weight. There was apparently recognition among leaders of Congress that the "come into agreement" clause had serious constitutional infirmities. Representative Patman in 1951, 97 Cong. Rec. 5443, and Senator Dirksen in 1954, 100 Cong. Rec. 5095, both espoused the position that the "come into agreement" clause was unconstitutional.

It appears that Congress then sought some device which would avoid the constitutional infirmity of this type of clause, and yet permit a degree of legislative oversight in public works authorizations. In this area, Congress had at one time enacted itemized enabling legislation, but more and more of the detailed decisions had necessarily been delegated to the Executive Branch because of the magnitude of the task. The result was the "no appropriation shall be made" clause, which was first used in 1954. *See* 100 Cong. Rec. 10016 (remarks of Sen. Holland).

A "no appropriation" clause is, by its terms, not a restriction on the Executive, but rather a directive to the Congress itself that there shall be a condition precedent for the enactment of appropriation legislation for a particular project or group of projects. That condition is the approval, by resolution of the appropriate substantive committees of each House, of any plan involving expenditure of federal funds beyond a minimum amount. Sponsors of the measure have stated that such a requirement could, if desired, be enforced by a point of order in any floor debate of an appropriation bill containing funds for projects which have not been so approved by committee resolution.

This is the kind of provision which appears in the Watershed Act with which President Nixon must now deal. President Johnson faced the question whether to approve legislation containing this type of provision in several instances. In the Water Resources Research Act of 1964, Pub. L. No. 88-379, 78 Stat. 329, for example, President Johnson approved the Act but stated:

> Although this legislation is so phrased that it is not technically subject to constitutional objection, it violates the spirit of the constitutional requirement of separation of power between the executive and legislative branches.

Statement by the President Upon Signing the Water Resources Research Act, 2 *Pub. Papers of Pres. Lyndon B. Johnson* 861, 862 (July 17, 1964).

However, as the clause was used with greater frequency by Congress during the succeeding years of the Johnson Administration, the President adopted the position that "no appropriation" provisions were subject to the same constitutional infirmity as the older "come into agreement" provisions. *Pacific Northwest Disaster Relief Act of 1965—Veto Message: Message from the President Returning Without Approval, the Bill (S. 327) Entitled "An Act to Provide Assistance to the States of California, Oregon, Washington, Nevada, and Idaho for the Reconstruction of Areas Damaged by Recent Floods and High Waters,"* S. Doc. No. 89-34 (1965); *Construction at Military Installations: Message from the President of the United States Returning Without Approval the Bill (H.R. 8439) to Authorize Certain Construction at Military Installations, and for Other Purposes*, H.R. Doc. No. 89-272 (1965). In signing into law a number of bills containing such provisions, President Johnson indicated in the signing statements that he did not recede from his position that the "no appropriation" clauses were unconstitutional.

The arguments that a "no appropriation" clause is vulnerable to the same constitutional attack as the older "come into agreement" clause are ably stated in the testimony of my predecessor, Assistant Attorney General Frank M. Wozencraft, given before the Subcommittee on Separation of Powers of the Senate Judiciary Committee, September 15, 1967. The thread of these arguments is that the "net result" of the former is the same as the latter—before appropriated money may be spent by the Executive, the approval of committees of Congress is required. If this

is bad under the separation of powers arguments in the case of the "come into agreement" clause, it must be equally bad under the "no appropriation" clause since the Constitution looks to substance, rather than form.

These arguments are fully developed, pro and con, in the transcript of the hearings at which Assistant Attorney General Wozencraft testified. SOP Hearings at 201–34. With all deference, I am unable to concur in his conclusion with respect to "no appropriation" clauses. In taking this position, I feel supported to some extent by the fact that Acting Deputy Attorney General Minor, during the Eisenhower Administration, likewise saw no constitutional infirmity in such a clause. He stated:

> It is clear that the purpose of the new provision is designed to place in the Senate and House Committees on Public Works the same practical control over the administration of the lease-purchase program as did the provisions of the Senate version of the bill to which the Department objected on constitutional grounds. However, the new provision in the enrolled bill may be said to constitute an exercise of the rule-making power of the respective Houses in specifying the procedure to be followed by the Senate and House Appropriations Committees in determining appropriations for lease-purchase purposes. Thus viewed, there can hardly be objection on constitutional grounds to Congress directing its appropriations committees not to recommend funds to carry out lease-purchase agreements which have not been approved by the committees on Public Works . . . .

D.J. File 145-100-01-1, § 3.

Sweeping generalizations which assume a distinct line between "legislative" functions and "executive" functions and which assume that in every instance "form" must give way to "substance" are particularly suspect in the area of constitutional law. There is undoubtedly a line beyond which Congress may not go in seeking to control the administration of a law after that law has gone through the legislative process, but the "no appropriation" clause by its terms does not seek to reach out beyond the legislative preserve in such a manner. Because it confines its operative effect to the Legislative Branch, whereas the "come into agreement" clause did not, the change is one of substance as well as form. Congress may ultimately achieve the same degree of oversight with the "no appropriation" clause as with the "come into agreement" clause, but since the former accomplishes that result without invading the executive domain, the distinction is of constitutional significance.

I have given weight, in formulating my opinion as to constitutionality, to the fact that the particular application of the clause in the act in question now before the President is one which seeks only to exercise legislative oversight in an area

where Congress has traditionally performed this function by enacting itemized public works authorizations. Since the basic argument for unconstitutionality is based on the idea of separation of powers, it cannot be irrelevant that the effect of the "no appropriation" clause in this particular act is to retain for congressional committees a share in the decision about individual projects of a type which were once within the sole domain of Congress and its committees. Different constitutional considerations might be presented if the function which Congress sought to oversee were one which had traditionally been associated with the Executive, rather than with the Legislative Branch. Examples are the closing down of military bases and the devising of weapons systems.

It is enough in this particular situation that Congress has sought to extend its legislative oversight into an area which has traditionally been the prerogative of the Legislative Branch, rather than that of the Executive, and that it has done so with a provision which by its terms binds only the Congress and not the Executive. This being the case, in my opinion, the Act which the President is presently called upon to administer does not encroach upon any reasonable view of the executive function and therefore suffers from no constitutional infirmity.

A corollary of the interpretation that the "no appropriation" language is merely an internal rule of Congress is that it does not bind the Executive. Thus, if Congress passes general, unspecified watershed appropriations, as it has in the past, the Executive is entitled to treat this money as finally appropriated and allocable to projects which have not received committee approval.

This is not to suggest that the Secretary ought not, as a matter of policy in cases where funds have already been appropriated, consult with the affected congressional committees about particular projects. But such consultation would be a matter of comity rather than a requirement of law. Indeed, it appears that the previous administration interpreted the clause to mean no expenditure should be made without the approval of the committees, and accordingly consultation with the committees was considered required by law.

The Executive thus has the power to insure that the "no appropriation" clause is administered according to its terms, if it desires to proceed in that direction. If in fact Congress wishes to require the Executive as a matter of law to present projects to its committees for approval, it would seem a reasonable prediction that appropriations will not be made in future years until projects have in fact been approved by the committees.

### III. Policy Matters

The fact that a provision in an act is not unconstitutional does not, of course, mean that it is either wise or, from the point of view of the Executive, desirable. The President might feel that he wishes to exert continuing pressure upon Congress to adopt the "report and wait" provisions which President Johnson felt were a desirable substitute for the "no appropriation" provisions. The former

would require the Executive, before spending appropriated money, to notify the appropriate committees of the specific projects upon which the money was to be spent, and to thereafter wait a given period of time—preferably 30 or 60 days—before actually making the expenditure. During the waiting period, Congress (if it were in session) would have the power to override the proposed executive action by a legislative act subject to the President's veto. Likewise, if the President felt that the administration of the "no appropriation" clause was defective, either in overall fairness of project allocation, or in degree of conformity to the terms of the clause, he could use the veto as a matter of policy, without entangling himself in the constitutional imbroglio in which his predecessor found himself.

WILLIAM H. REHNQUIST
*Assistant Attorney General*
*Office of Legal Counsel*